THE STATE OF MARYLAND *vs.* WAYMAN, and WAYMAN *vs.* THE STATE.—*Cross Appeals.—June*, 1830.

All appointments to office, under the constitution, by the executive of the State, are made by the authority of the 40th, 48th and 49th sections, and the Register in Chancery not being commissioned during good behavior, is necessarily an officer of annual appointment, under the 49th section:

The tenure of his office being limited, he cannot continue to act after his term expires, except in the single instance of the appointment of a successor, in which case he may act until such successor, commissioned in his stead, is qualified. If re-appointed, he may continue to act without any new commission or qualification, but unless re-appointed he is not legally an incumbent of the office, and cannot lawfully perform any of its duties.

Where the constitution limits the duration of an officer to a certain term, no irregularities in the proceedings of the appointing power, can extend it beyond that period.

By the 49th article of the Constitution of Maryland, "all civil officers of the appointment of the Governor and Council, who do not hold commissions during good behavior, shall be appointed annually in the third week in November ; but if any of them shall be re-appointed, they may continue to act without any new commission or qualification ; and every officer though not re-appointed shall continue to act until the person who shall be appointed and commissioned in his stead shall be qualified." Under this clause, B was commissioned as Register in Chancery, in January, 1812, and gave bond on the 24th January, 1816, in conformity to the *Act of* 1742, *ch.* 10, the condition of which was such, that "if above bounden B, whilst he shall continue in the office of Register, shall," &c. discharge various enumerated duties, and that in case of death, or that he shall be legally dismissed from officiating longer in the said office, he or his executors, &c. shall surrender to his successor all the records, &c. "*made during* the time he hath officiated in the said Register's Office." He continued to hold the office and discharge its duties without any re-appointment, until 1821, and omitted to record proceedings and decrees of the Court, of which it was his duty to keep records, during every year he was in office. These records were afterwards completed at the public expense, and an action was brought on his bond against his security, to recover the money expended by the State : HELD, that the bond was executed with an express reference to the provisions of the Constitution, and that its condition did not create a responsibility beyond them ; that its object was to engage for a faithful discharge of duties as long as they could be legitimately performed under the official grant and no longer, and that the defendant was responsible under the bond for the conduct of B, as Register of the Court of Chancery, to the expiration of the third week in November, 1816.

State of Maryland *vs.* Wayman, and Wayman *vs.* the State.—1830.

A recital in the condition of a bond may restrain indefinite expressions used in it, and adapt them to the intention of the parties.

Where a surety is sued upon a bond, the utmost that can be recovered is the penalty, and legal interest thereon, by way of damages for the detention of the debt from the time the debt is demanded—that is the import and effect of his contract, and his accountability cannot be stretched beyond it.

It is not in every case that interest by way of damages is to be recovered on the penalty, and when the case occurs, it may be considered as an exception to the general rule, which limits the recovery by the penalty in the bond.

Where a jury is called upon to assess the damages for breaches assigned or proved in the condition of a collateral bond, and are wholly unauthorised by the issue to find damages for the detention of the debt, a recovery must be limited to the penalty of the bond.

Where various persons have distinct demands secured by the same bond, a recovery and payment in one suit can be no bar to other actions, in which the several claimants may recover to the same extent, and can only be limited by the penalty, and in particular cases by the penalty and interest.

In an action upon the official bond of the Register of the Court of Chancery by the State, for omitting to make the proper record books, a recovery may be had for omissions to record proceedings in suits to which the State was not a party, and on account of which nothing was paid to such Register by the State. The measure of damages is the sum paid by the State for doing that, which the officer should have done.

The records of our Courts of Justice are to be considered as public property, and so important is it to the community, that they should be made up correctly, and preserved with care, that when a neglect in these particulars occurs, an obligation is imposed on the State to supply the defect, and have the work done at the expense of the treasury. The defaults of the officers, are thus visited on the public, and their bonds afford the only means of security for the State to resort to against loss.

Evidence which leaves the mind in doubt, whether by a further search, certain record books sought for, might not have been regained, is not sufficient to let in parol evidence of their contents.

Where it was the duty of the Register in Chancery to make and keep records of the proceedings of his Court, his report to the Chancellor that he had made such records, and the statement of the Chancellor on the minutes of the Court, that such records had been made up, do not constitute primary evidence to shew that such records were made, and in the absence of satisfactory proof of the loss of the record books themselves, are not admissible as secondary evidence of the same fact, nor is the estimate of a subsequent Register, made by the direction of the Legislature, of the sum it would require to furnish a substitute for such record books, nor his evidence that the same had been all correctly made up, admissible under such circumstances.

State of Maryland *vs.* Wayman, and Wayman *vs.* the State.—1830.

The constitution is to be construed with reference to the laws existing at its adoption and the practice under them.

APPEAL from *Anne Arundel* County Court.

This was an action of *debt*, brought on the 23d of September, 1825, in the name of the *State of Maryland*, against *Henry Wayman*, on the following bond, which was duly certified by the Clerk of the Court of Appeals, to be a true copy from the original on file in his office. The defendant pleaded general performance—replication, non-performance and issue.

" *Maryland, sct.* Know all men by these presents, that we, *Thomas Hamilton Bowie, Jesse Ray, Francis T. Clements* and *Henry Wayman*, of *Anne Arundel* County, are held and firmly bound unto the *State of Maryland*, in the full and just sum of two thousand six hundred and sixty-six dollars and sixty-six cents and two-thirds of a cent, current money, to be paid to the said *State of Maryland.* To the which payment well and truly to be made and done, we bind ourselves, our and each of our heirs, executors and administrators, jointly and severally, firmly by these presents. Sealed with our seals, dated this twenty-fourth day of January, in the year of our Lord one thousand eight hundred and sixteen. The condition of the above obligation is such, that if the above bounden *Thomas Hamilton Bowie*, whilst he shall continue in the office of Register of the Court of Chancery, shall, at his own proper cost and charge, find a supply of good and sufficient record books necessary for the entering up of all matters and things relating to such Register of the Court of Chancery office, and shall and will make or cause to be made and entered, true, legal and perfect records and entries, according to the truth and nature of the matter or thing requiring to be entered or recorded—and shall duly and carefully look after, sustain, preserve, repair and maintain, all the several books, papers and records now being and remaining in the said office, as also those that from time to time during his continuance in the said office shall be added thereunto, in such manner as

that in case of death, or that he shall be legally dismissed from officiating longer in the said office, he the said *Thomas Hamilton Bowie*, his executors or administrators, shall surrender and deliver up, or cause to be surrendered and delivered up to the next person who shall succeed him in the said Court of Chancery or Register's office, all the papers and record books now being in the said Register's office, in good order and repair; as also all such other papers and record books, which shall be by him added in like good order and repair, with the records and entries faithfully, legally, and truly made up and entered *during the time he hath officiated in the said Register's office;* without favor or affection, but according to the truth, the nature of the thing and the duty of his office, and all other the duties of his said office legally, duly and faithfully discharge, according to law, and the true intent and meaning of the Acts of Assembly in such cases made and provided—that then the above obligation to be void and of none effect, or else to be and remain in full force and virtue in law."

1st. EXCEPTION. The plaintiff proved that *Thomas H. Bowie*, the obligor in the condition of the writing obligatory mentioned, was duly appointed and commissioned as Register in Chancery on the 23d January, 1816, and continued to hold the said office and discharge the duties thereof, without any re-appointment, until the —— day of 1821. That he received no other appointment to the said office, except the one above mentioned, and continued until his death to hold and exercise the said office, under the aforesaid appointment. That in 1816, and every other year after he received his said appointment until his death, he omitted to record proceedings and decrees which it was the duty of the Register of the Court of Chancery for the time being, by law, to record, and nevertheless sent out and collected and received his fees for recording proceedings which never were recorded by him, and which have since been recorded by the *State* at the public expense, and for which

the *State* has paid between $5,000 and $6,000. That the amount of fees improperly charged and received by the said *Bowie,* during the time he so held the office, amounted to the sum of about one thousand pounds current money. Whereupon the plaintiff prayed the opinion of the Court, that the plaintiff is entitled to recover in this action, for the failure of the said *Thomas H. Bowie,* to record all proceedings from the date of his said bond to the time of his death, which it was the duty of the Register of the said court, for the time being, to record.    1st. Because under the appointment above mentioned, he was lawfully the Register of the said court until his death, without any new appointment, and the bond in question therefore continued in force until his death.    2d. Because the condition of the said bond, by its terms, covers the whole time he continued in office under the original appointment, or a succession of annual appointments.    3d. Because the condition is broken, if all the papers and record books which were by him added while he held the office, in manner above mentioned, were not at his death in good order and repair, with the records and entries for all that time, faithfully, truly, and legally made up and entered—which opinion and direction the Court [DORSEY, Ch. J., KILGOUR and WILKINSON, A. J.] refused to give—but were of opinion, and so directed the jury, that the defendant in this cause *cannot be charged* with any such alleged default of the said *Thomas H. Bowie,* arising subsequently to the expiration of the third week in November, in the year 1816.· The plaintiff excepted.

2d. EXCEPTION. In addition to the evidence stated in the first bill of exception, the plaintiff offered in evidence, that the *State* had sustained damage to the amount of more than $4000, by the default of the said *Thomas H. Bowie,* as Register in Chancery, committed before the end of the third week in November, 1816; and thereupon the plaintiff prayed the opinion and direction of the Court to the jury, that if they find, from the evidence, that the State has sustained damage to the amount of $4000, by the default of

the said *Thomas H. Bowie*, as Register in Chancery, committed before the end of the third week in November, 1816, contrary to the condition of the bond, on which this suit is brought, that then the plaintiff is entitled to recover the above mentioned sum of $4000, notwithstanding the penalty of the said bond is only one thousand pounds. Which opinion the Court refused to give; but were of opinion, and directed the jury, that the plaintiff was not entitled to recover more than one thousand pounds, the penalty of the bond; (the opinion on this exception was given *pro forma*, by consent—) The plaintiff excepted.

3d. Exception. In addition to the evidence before stated in the preceding bills of exceptions taken by plaintiff, the plaintiff by *its* attorney offered the resolution of the General Assembly of Maryland, for 1822, No. 66. "Whereas it appears that many of the papers and proceedings in the Chancery office, remain unrecorded during the time that *Samuel H. Howard, Nicholas Brewer, James P. Heath* and *Thomas H. Bowie*, acted as registers of said Court, and which papers they ought to have had recorded, inasmuch as they received payment for the same by the parties interested therein; therefore, *Resolved*, That the present Register in Chancery be, and he is hereby authorised and required, to proceed to examine all the unrecorded papers in his office, and ascertain as near as practicable, the probable cost of recording said papers, calculating the cost at the same rate he now receives per side, for recording papers of a similar nature, and report the result of his examination to the Governor and Council, and also to the next Legislature, stating distinctly the amount it will cost to record the papers and proceedings which each of the aforesaid Registers ought to have had recorded, in compliance with the existing laws."

The plaintiff also offered in evidence the report made by the Register in pursuance of this resolution. "Chancery office, 17th December, 1823: In obedience to a resolution of the *General Assembly of Maryland*, passed at the last

session of the Legislature, directing the Register of the Court of Chancery to report to the next General Assembly, what will be the probable cost of recording all such papers as remain unrecorded, and which ought to have been recorded by each of the former Registers respectively, the Register begs leave to state, that in order to make such a report as appeared to him to have been contemplated by the Legislature by their resolution, he has found it necessary to examine individually, all the papers in his office remaining unrecorded. He has made this examination with great care and attention, and in the course of it has assorted the papers, and selected from the great mass of them, such as by the existing law are required to be recorded. These papers, which comprise about three-fourths of the whole, consist of all decrees passed since the year 1785, which direct a sale, conveyance or partition of lands, and real estate generally, for the recording deeds, and for the transfer of title under special acts of Assembly. The following as the result of his examination, the register respectfully reports for the consideration of the Legislature. The probable cost of recording such of the above mentioned papers as ought to have been recorded by *Samuel Harvey Howard*, Esqr. is estimated at $4,500. The probable cost of such as ought to have been recorded by *Nicholas Brewer*, Esqr. is estimated at $3,000. The probable cost of recording such as ought to have been recorded by *James P. Heath*, Esqr. is estimated at $1,500. The probable cost of recording such as ought to have been recorded by *Thomas H. Bowie*, Esqr. is estimated at $1,500. All which is respectfully submitted. *Ramsay Waters, Reg. Cur. Can.*"

And also offered in evidence the resolutions of 1825, No. 29, 73, 117; and the resolution of 1823, No. 14, and the resolution directing the Register to deliver the papers.

" No. 29. *Resolved*, That the Governor and Council be, and they are hereby authorised and required, to take under their superintendence the papers remaining unrecorded in the Chancery Office, and which should have been placed

on record by *Samuel H. Howard, Nicholas Brewer, James P. Heath* and *Thomas H. Bowie,* Esqrs. late Registers in Chancery.

*Resolved,* That the governor and council be, and they are hereby authorised and required, to cause such of said papers as are required by law to be recorded, to be registered as soon as may be, in proper books to be procured for that purpose, and that such books of registry, after they are completed, be deposited and remain among the archives of said office.

No. 73. Whereas by resolutions of the present Assembly, the governor and council are authorised to procure certain valuable papers remaining in the Chancery office to be recorded: And whereas the governor and council entertain doubts of their authority under said resolutions to carry into effect the intention of the General Assembly in passing them; therefore,

*Resolved,* That the Governor and Council be, and they are hereby authorised and empowered, to contract in the name of the State, with some person or persons of integrity, understanding, and other proper qualifications, to discharge the labor and duties mentioned in said resolutions; and the Governor and Council are hereby authorised to draw quarterly and yearly as the work progresses, on the Treasurer of the Western Shore, which drafts the said treasurer is hereby directed to pay for such sums as may be necessary to meet the demands of the persons engaged in said work.

No. 117. *Resolved,* That the Register in Chancery be, and he is hereby authorised and required, before he deliver to the Governor and Council, or their order, any paper or papers in his custody, which by resolutions of the present General Assembly, the executive may be authorised to withdraw from his custody, to demand and receive a receipt, which shall sufficiently identify the said several papers and the cause or causes to which they relate; and the said receipt shall be sufficient in every case to discharge him from all responsibility on account of the safety or preservation

State of Maryland *vs.* Wayman, and Wayman *vs.* The State.—1830.

of said papers, until the same shall have been returned to his charge and custody.

No. 14. *Resolved*, That if the said Registers in Chancery, clerks of the Court of Appeals, clerks of the several County Courts, Registers of Wills in the several counties of this State, and the clerk of the City Court of Baltimore, who have failed to record such papers as by them respectively ought to have been recorded, shall not complete the records of the same on or before the first day of January, in the year eighteen hundred and twenty-five, then that the Governor and Council be, and they are hereby authorised, to direct the Attorney General, to institute such suit or suits as may be necessary for the recovery of such demands as may be due by each or all of said Registers in Chancery, clerks of the Court of Appeals, clerks of the several County Courts, Registers of Wills in the several counties of the State, and clerk of the City Court of *Baltimore.*

Also the following proceedings of the executive : " *Saturday*, January 4th, 1826. The Council met. Present, His Excellency *Joseph Kent*, Governor, and the Honorable *Joseph Gabby, William Stewart, Robert H. Archer, Daniel Martin* and *John H. Steel*, members of the Council. *William D. Beall, George Brown, Isaac Hines, Henry Hobbs* and *Joseph Mayo*, appointed to record the papers mentioned in the resolution of the present session, at twenty-five per cent. less than the law allows for the performance of such labors; the whole to be executed under the superintendence of the Register of the Court of Chancery, who shall be answerable to the executive for the faithful execution of his trust, and receive as full compensation therefor twenty per cent. on said allowance, to be paid by deductions at that rate from the work done by each person appointed as above. Stationary to be furnished by the executive."

The following communication was received from *Ramsay Waters*, Esq. Register in Chancery, which was ordered to be entered upon the records of proceedings, viz :

State of Maryland *vs.* Wayman, and Wayman *vs.* The State.—1830.

"Chancery Office, 6th March, 1826. To the Honorable the Executive of Maryland: Gentlemen. A communication from your honorable body has been handed to me this morning, and I have given to it the most respectful consideration. I understand the communication to be an offer from the executive of compensation for certain services which they wish me to perform. The nature and extent of those services, and the heavy responsibility they impose, have been well considered. I think the proposed compensation wholly inadequate, and therefore cannot consent to accept. Respectfully your obedient servant, *Ramsay Waters.*"

Whereupon the following proposition was made, adopted and signed by the Governor and Council, viz: "Council Chamber, Annapolis, March 6, 1826. *Ramsay Waters,* Esq. Register in Chancery, having refused to accede to the proposition made him by the executive, for superintending the recording of the Chancery papers mentioned in said proposition, the executive offered the same terms to Mr. *Thomas Culbreth,* Clerk of the Council, who accepted thereof, and is hereby ordered to take the papers mentioned in the resolutions of the General Assembly, to be recorded under his charge and superintendence, in such parcels as may be necessary for the due performance of the work, the same to be regularly listed and receipted for, and not to be taken out of the state house, and to be at all times subject to the examination of the Register in Chancery." April 20th, 1826.—"Ordered, that *Ramsay Waters,* Register of the Court of Chancery, be authorised and required to deliver to each and any of the gentlemen appointed by the executive, namely, *William D. Beall, George Brown, Isaac Hines, Henry Hobbs* and *Joseph Mayo,* to record the unrecorded Chancery papers, under resolutions of the General Assembly, such portions of the said papers, dockets and other books relating thereto, as may be necessary to enable them to proceed with the said recording upon the order of *Thomas Culbreth,* under whose superintendence the papers have been placed by the executive."

No. 1. Extract from the proceedings of the Executive, May 7, 1825:

" *Ordered,* That the clerk write to the Attorney General, and direct him to commence suits against all Registers in Chancery, Clerks of the Court of Appeals, Clerks of the several County Courts, Registers of wills, and Clerks of the City Court of *Baltimore,* who have failed to record such papers as by them respectively ought to have been recorded, who have not completed the same agreeably to the resolution, No. 14, passed at December session, 1823." And also offered in evidence the following letter to the Attorney General:

" In Council, Annapolis, May 7, 1825. Sir,—In compliance with a resolution of the General Assembly, passed at December session, 1823, No. 14, you are hereby directed to institute such suit or suits as may be necessary for the recovery of such demands as may be due from each and all of the officers mentioned in the said resolution, who have failed to record such papers as by them respectively ought to have been recorded, and who have not completed the records of the same. I have the honor to be, with due respect, your obedient servant, *Thomas Culbreth,* Clk. of the Council. *Thomas Kell,* Esqr. Attorney General."

And the plaintiff also offered in evidence the original records made under the said resolutions and proceedings, and which have been by the said *Thomas Culbreth* returned to the Governor and Council and accepted by them, and now remain in the council chamber for the purpose of binding up before they are deposited in the Chancery office; and offered in evidence that they had cost the *State* between twenty-seven and twenty-eight thousand dollars, which has been paid by the *State ;* and that the proceedings in Chancery before the end of the third week in November, 1816, required by law to be recorded by the said *Thomas H. Bowie,* and left unrecorded by him, have been recorded under the said resolutions, and accepted by the Governor and Council, and deposited in the council chamber as aforesaid ; and produ-

ced the said records here in Court, and offered in evidence that these last mentioned records cost the *State* about $725, which it has paid to the persons employed to make the said records in the manner above mentioned. The defendant offered in evidence from the said records so produced, that many of the said cases improperly omitted to be recorded by the said *Bowie*, were suits between individuals to which the *State* was not a party, and in which the *State* had no other interest than what belongs to it as the guardian of the rights of its individual citizens. Whereupon the defendant by his counsel, prayed the Court to instruct the jury, that the plaintiff in this action is not entitled to recover from the defendant damages for the omission by *Thomas H. Bowie,* to record proceedings and decrees in suits to which the *State* was not a party, and on account of which nothing was paid to the said *Bowie* by the *State,* or by him demanded of it. Which instruction the Court refused to give. The defendant excepted.

4th. EXCEPTION. In addition to the evidence stated in the preceding bills of exceptions, the defendant to support the issue on his part, proved by *Ramsay Waters,* Register of the Court of Chancery, that there were two record books in the Chancery office, in which were recorded proceedings required to be recorded by *Mr. Bowie.* That he has searched for them in the office repeatedly, but never at the request of the defendant or his counsel, and that they are not now in the office; that he missed them out of the office last summer; that he does not know by whom they were taken out; that he has never made any particular search for them out of the office, because he supposed that they were in the hands of some of the persons engaged in recording the Chancery records above mentioned, and supposed they were in the hands of *Joseph Mayo.* And also offered in evidence by the said *Mayo,* that he does not recollect taking out the said books, and does not know that he ever saw them out of the office; that he saw some dockets in the committee room of the house of delegates, and these

two record books may for aught he knows have been
among them; that he supposed that all of these books had
been returned to the Chancery Office, but does not know
that they were; that he went to-day to examine the book
cases in the committee room of the House of Delegates, but
he found that the book cases were locked up, and the key
said to be in the possession of *Gideon Pearce,* the Clerk of
the House of Delegates, who resides in this place, but who
is now on the Eastern Shore, and witness could not there-
fore make the examination he wished. The plaintiff also
offered in evidence by *Charles Thompson,* a Clerk in the
Office of the Register in Chancery, and who has been en-
gaged as clerk in that office for three years, that more than
three years ago he saw one of the record books of the time
of *Thomas H. Bowie,* in the library in the State House,
where they were recording the Chancery proceedings
under the resolution of the Legislature; that witness was
not at that time a clerk in the office of the Register in
Chancery, and does not know what has since become of the
book, and has never enquired for it. The defendant then
offered in evidence by *Louis Gassaway,* the principal
clerk in the office of the Register in Chancery, that the
defendant yesterday, while his trial was going on, applied
to him about the two record books made in *Mr. Bowie's*
time; and the witness informed the defendant that they
were not in the Chancery Office, but he believed that either
*Joseph Mayo,* who was the principal agent under *Mr. Cul-
breth* for superintending the recording of the Chancery
papers under the resolution of the Legislature, or some of
those engaged in recording the Chancery papers, had them.
The defendant further offered in evidence that he then ap-
plied to said *Mayo,* who said that they might be among the
books and dockets that were in the committee room of the
House of Delegates, which had been used by the clerks
when employed in recording the Chancery papers, and that
he would examine there for them; that witness went to
examine last evening, but found the book cases locked, and

learned on inquiry that *Gideon Pearce* the clerk of the House of Delegates, who has the key of the said book cases, is now on the Eastern Shore of this State, and witness was therefore unable to make the examination, and does not know whether the books are there or not. And after the aforesaid evidence was given, the defendant by his counsel, *offered* to read in evidence from one of the original minute books of the Court of Chancery, the following reports and orders:

"In Chancery, September Term, 1818.—On examination of the dockets and files in the office of the Register of the Chancery Court, laid before me in pursuance of the order of the 2d instant, it is ordered, with respect to the decrees, papers and proceedings in the time of *Thomas H. Bowie,* the present register, remaining unrecorded, that six hundred sides of the said decree, papers and proceedings from December term, 1815, ought to be recorded from the present time to the 31st instant, inclusive, an entry of which portion and period assigned the said register, is directed to make; and at the termination of the period above prescribed, to wit, on the first day of December term next, being the first day of the month, the book is to be brought before me for my determination, whether the records are made up in the manner required by the act of 1817, *ch.* 119. *W. Kilty, Chr.* November 5th, 1818."

"In Chancery, December Term, 1818.—On the first day of December, 1818, that being the first day of this term, the Register submitted to the Chancellor the following report, in obedience to the aforegoing orders. To the honorable *William Kilty,* Esquire, Chancellor of Maryland. In obedience to the several orders of your honor, dated the 5th day of November, 1818, relative to the decrees, papers and proceedings in the Court of Chancery: 'That he now submits to your honor, for your inspection, two record books, which are marked, the one Liber. T H B. No. 1, and the other marked Liber, T H B. Sales, No. A— which books he has procured and in them recorded as

he was directed, the number of sides of the decrees, papers and proceedings of the Court, during the time he has been Register, and remaining unrecorded, pointed out by your honor in that order, which relates to himself." *Thomas H. Bowie,* Reg. Cur. Can.

"In Chancery, December Term, 1818.—On considering the above and within report, and the books therein referred to, (relating to the decrees, papers and proceedings of *Thomas H. Bowie,* the present Register,) being brought before me according to the order, passed November 5th, 1818, I do determine from what appears, that the records are made up to the time, appearing in said books, in the manner required by the *Act of* 1817, *ch.* 119, *sec.* 6. It is further ordered, with respect to the decrees, papers and proceedings of *Thomas H. Bowie,* the present Register, that from this date to the first day of March term next, there ought to be recorded 4000 sides, commencing from the termination of what has been done under the former order. *William Kilty,* Chr. December 1st, 1818."

And the defendant then offered in evidence similar reports of the Register, and orders of the Chancellor thereupon, in the years 1819 and 1820.

To the admissibility of which said reports and orders in evidence for the purpose of proving that the said *Thomas H. Bowie,* had recorded any of the proceedings before the third week in November, eighteen hundred and sixteen, which he as Register in Chancery was bound by law to record, and which by the records produced appear to have been recorded under the direction of the Governor and council in the manner before stated, the plaintiff by his counsel objected—and the Court sustained the objection, and refused to permit the aforesaid entries in the said minute book, to be read in evidence for the purpose aforesaid. The defendant excepted.

5th EXCEPTION. In addition to the evidence stated in the preceding bills of exceptions numbered 1, 2, 3 and 4, the defendant produced as a witness, *Ramsay Waters,* Esq.

the present Register of the Court of Chancery, who succeeded *T. H. Bowie*, and has been the Register ever since, and by him proved that in the year eighteen hundred and he was directed by the General Assembly to report to the succeeding Legislature, an estimate of the probable costs of making up the records of the several Registers, and among the last, those of said *T. H. Bowie;* that he performed the duty with as much care and accuracy as he could, having till the next meeting of the General Assembly to complete it, and that according to the most accurate estimate he could make, the costs of making up the records of said office, whilst said *T. H. Bowie* was the Register, to wit, from 1st January, 1816, to February, 1821, would be $1500. And the defendant then offered to prove by said *Ramsay Waters*, that according to that estimate it would have cost nothing to complete the records, for not completing which, this suit is brought, because the records for that period of time had been all correctly made up by the said *Bowie*, in his life-time—to the admissibility of such last mentioned parol testimony so offered, the plaintiff by his counsel objected—and the Court was of opinion that the same was inadmissible and rejected the same. The defendant excepted.

6th EXCEPTION. Upon the whole evidence stated in the preceding bills of exceptions, the plaintiff by his counsel prayed the opinion of the Court, that the books produced being records of the proceedings in the Court of Chancery, made out and recorded by the persons authorised and required by law to record the same, are of themselves *prima facie* evidence, that the papers and proceedings were such as the law required to be recorded by the said persons— and inasmuch as the defendant is liable for the default of the aforesaid *T. H. Bowie*, in not recording the proceedings in the Court of Chancery, which it became his duty between the date of his bond and the end of the third week in November, 1816, to record, that the plaintiff is entitled in this action to recover the damages sustained by the *State,*

**270 CASES IN THE COURT OF APPEALS**

State of Maryland *vs.* Wayman, and Wayman *vs.* The State.—1830.

for such default of the said *T. H. Bowie,* and that the measure of damages is the sum paid by the *State* for recording the proceedings which it became the duty of the said *Bowie,* during the period last above mentioned to record, unless the defendant can shew by the inspection of the said books or other records of the Court of Chancery, that papers and proceedings have been illegally recorded in the books above mentioned, or that the *State* has paid an unreasonable sum for the said recording. To the giving of which instruction the defendant by his counsel objected, for admitting the right of the *State* to sue for the expenses incurred in the completion of said records—yet the whole of those expenses have been incurred since the institution of this suit. Because the papers which have been transcribed are not records, and have no right to be considered as such—and because said papers were selected by the persons who were merely appointed to transcribe the papers required by law to be recorded, and were not authorised to decide what papers ought to be recorded, and by the terms of the contract were to be paid according to the number of sides which they might record—and because the bond upon which this suit is brought, was not required by the Constitution, or any existing law, and therefore the defendant is not responsible under said bond, for the conduct of said *Bowie,* as Register of the Court of Chancery, for any period of time—and because the original papers have not been produced, and there is no proof that the copies have ever been examined or compared with the originals. But the Court gave the instruction as prayed by the plaintiff's counsel. The defendant excepted. Verdict and judgment for the plaintiff for $652 12; both parties appealed to the Court of Appeals.

The cause was argued before BUCHANAN, Ch. J., EARLE, MARTIN, STEPHEN and ARCHER, J.

*Tany*, (Atty. Genl.) and *Boyle* for the State,

Contended, on the *first* bill of exceptions, that the plaintiff is entitled to recover, in this action for *Bowie's* failure to record all proceedings from the date of his bond to the time of his death, which it was the duty of the Register of the Court of Chancery to record.

1. Because under the appointment as Register of the Court of Chancery, he was lawfully the Register of the said Court until his death.

2. Because the condition of his bond as Register, by its terms covers the whole time he continued in office, under the original appointment, or a succession of annual appointments.

3. Because the condition is broken, if all the papers and record books, which were by him added, while he held the office in manner above mentioned, were not, at his death, in good order and repair, with the records and entries for all that time, faithfully, and truly, and legally made up, and entered.

On the *second* bill of exceptions, they insisted, that the *State* may recover, beyond the penalty of the bond, if more than the penalty of the bond should be proved to be due.

The great question arises on the *first* exception, which involves the enquiry, whether the office of the Register of the Court of Chancery, is an annual appointment. According to the practice, the appointment is not annually made; it follows, therefore, if the office is one to which the incumbent must be annually appointed, that for a long time since the adoption of the Constitution we have had no Register. They referred to the *Act of* 1716, *ch.* 1, *sec.* 1, 3, 5; 1742, *ch.* 10, *sec.* 2, 3, 7—*Constitution, Art.* 10, *sec.* 49. If the language of the Constitution is doubtful, then the contemporaneous construction, and continued practice of those who framed it, is entitled to great consideration. According to the Constitution the old officer is to continue to act, until a new one is appointed and qualified, and he holds in virtue of the old appointment—if then he may be

required to act beyond the third week in November, it follows that his bond will continue answerable. If his office continues, his responsibility, and his bond must continue—unless you disregard the words of the Constitution, which provides for the continuance in office of the old officer, you must say that he will so continue, and remain responsible, until a successor is appointed, and qualifies, no matter how long the period may be. The security, when he becomes such, must be supposed to look to this provision of the Constitution.

But if the appointment is annual, still the bond is good for more than one year. The bond is in conformity with the act of 1742, and it was competent to the Legislature notwithstanding the nature of the appointment, to require a bond for more than one year: they referred to the act of 1823, *ch.* 195. For what period was the bond intended to be given? This is a question on the construction of the bond. 2 *Maul. and Selw.* 369. Under the act of 1823, *ch.* 195, a bond would be good for two years, because the Legislature have directed that it shall be given for two years. Under the act of 1742, its obligation covers the whole period; the Register may remain in office, because such is the clear meaning of the act, and the power of the Legislature to require, and the party to give such a bond, can hardly be doubted.

The right to recover beyond the penalty of the bond, is the question presented by this exception. The *Act of* 1825, *ch.* 208, *sec.* 1, creates this difficulty—a surety in a public bond, cannot discharge himself by paying the penalty—the object of requiring the bond, is to provide personal security. The small amount of the penalty of Constables' bonds, being greatly below the sums which ordinarily must pass through their hands, shows that the Legislature never intended to limit the responsibility of the surety to the penalty.

Can it be contended, that in an action by a party to a constable's bond, that he or his sureties could discharge themselves by proving the payment of the penalty to a third person. The principal question on the 6th exception is, whether the *Registers* of the Chancery Court *are* required to give bond? The acts of the provincial legislature are in force, unless inconsistent with the provisions of the constitution. The 52d *section* of the constitution could not have been designed to disable the legislature from demanding a bond. The 10th *section* of the constitution authorises the putting of office bonds in suit, yet the only officer expressly required by the constitution to give bond, is the sheriff. They referred to the acts of 1800, *ch.* 82, *sec.* 2, and 1801, *ch.* 60. All the laws since the constitution requiring bonds, are invalid, if those prior to it are repealed by it.

3. Can the State recover, otherwise than as an individual, for suits in which she is interested? Act of 1742, *ch.* 10, *sec.* 7. The error on this subject is, in drawing our analogies from the powers of the king of England. The State can have no separate interest, as the king has. She is but a trustee, a mere agent, having no interest of her own, her interests, being the interests of the people. How could an injury, similar to the one now complained of, be redressed by an individual? The individual could not authorise the records to be made up; the expense of doing which could alone furnish the measure of damages. The State is interested in quieting titles, and preserving the harmony of the public. The act of 1742 provides for the disposition of the penalty of the bond. The papers in the office are not the property of the litigating parties. They are filed there for the benefit of those who claim under them, and cannot be withdrawn after being once filed. By the act of 1742, the Register was not only to keep the records in repair, but he was bound to record all the papers that were filed in his office for that purpose.

The question upon the 4th and 5th exception, is upon the admissibility of secondary evidence to prove the contents of a record. The record books were, of course, the best

evidence, and the question is upon the sufficiency of the foundation for the introduction of secondary evidence; reasonable diligence to procure the best proof, was not employed. There was no evidence of a careful search in the office, but if there was, yet as the books were seen out of the office, a mere search in the office, would not be reasonable diligence. The meaning of the rule that the best evidence must be sought for is, that you are to look where you are likely to find the thing sought after. The place where the record is kept, is not, of course, the place in which it is likely to be found. 1 *Jackson vs. Hasbrouck,* 12 *Johns. Rep.* 194. The orders of the Chancellor could not be evidence *per se.* They are passed upon an inspection of the record. His knowledge of the fact is derived from this examination. These orders and minutes are not judicial acts, and the fact that they certify the existence of the books, shows that there is better evidence than they themselves furnish.

Were the papers from the Council Chamber, records? The resolutions of the legislature, under which these papers were recorded, only authorised the withdrawal, and the Register to deliver such papers as the law require to be recorded. A record is made by transcribing papers authorised to be recorded by law, by persons who are authorised to do so, by law. Records are not required to undergo a previous examination before they are entitled to the consideration due to them as such. The papers from the Council Chamber were not offered as conclusive, but merely *prima facie* evidence, and the defendants were bound to have shown, in order to destroy their effect, either that the papers were not correctly copied, or that they contained proceedings not proper to be recorded. In regard to the objection, that the money was not paid, until after suit was brought, they insisted, that the right to sue, is for the breach of official duty;—it is that which gives the cause of action, and the money paid, furnishes the measure of damages; and as these papers were recorded for twenty-

five per cent. less than the law allows for such services, the defendant cannot complain of a measure so furnished.

*Magruder* and *Brewer* for *Wayman*—on *Wayman's* appeal.

1. The Registers in Chancery, are not legally required to give bond. 2. The *State* has no right to sue for the omission to record any case in which it is not a party, or interested in the event of the suit. 3. The minute books offered in evidence were primary, and the best evidence that could be offered to prove, that the records of the year 1816, were duly recorded by the said *Thomas H. Bowie.* 4. That the book, and parol testimony offered, ought to have been admitted, if secondary evidence only, it being sufficiently shown that recourse could not be had to the original records. 5. That the books produced are not *prima facie* evidence; that the papers and proceedings are such as the law requires to be recorded, and the amount paid by the *State*, is not the proper measure of damages. 1. Because the said books are not records. 2. Because the papers were selected by the persons appointed to transcribe the records, and who were not authorised to decide what papers ought to be recorded, and who were to be paid according to the number of sides transcribed. 3. Because the original papers have not been produced, and there is no proof that the copies have been examined and compared with the originals. 4. That the *State* is not entitled to recover in this action, the amount paid for recording said papers, because the whole was paid after the institution of this suit. 1. Officers, as a matter of course, are not required to give bond; there must be some law requiring it, and neither the constitution, or law requires it, in the case of the Register in Chancery—*Section* 52 prescribes his qualifications, but it is silent in regard to a bond. Sheriffs are directed to give bond, and if it had intended that the Register should do so, a similar requisition would have been adopted in regard to that officer. No bond was ever given by a Regis-

276      CASES IN THE COURT OF APPEALS

State of Maryland *vs.* Wayman, and Wayman *vs.* The State.—1830.

ter, from the adoption of the constitution, until 1811. 2. But if a bond is necessary, still the *State* can only recover for breaches in reference to cases in which she is a party, or is interested. The papers in the Chancery office are the property of the parties, until they are put on the record; until then the *State* had no interest. They referred to the acts of 1716 and 1742. The 5th *section* of the act of 1716 authorises the *State* to sue only when the records are not in repair, and by the same section, individuals are empowered to sue for damages sustained before the proceedings are recorded.

The 4th and 5th exceptions presents the question of the nature of the evidence, which the defendant is to produce, that the papers have been recorded. The object in offering the orders and minute book, was not to prove the contents of the record books, but to show the *existence* of such books. In controversies of a civil nature, the record books cannot be produced; their contents can only be proved by exemplified copies. The contents of a record can only be proved by the book itself, or a copy; because the contents cannot be carried in the memory, but proving the *existence* of the book, is a different affair. The proof that the proceedings in question have been recorded, is that of the very officer to whom the act of 1817, *ch.* 119, *sec.* 6, had confided the duty of prescribing those that should be recorded. To show that the evidence offered, if regarded merely as secondary, was admissible, they referred to 12 *Johns. Rep.* 194.

On the appeal of the *State*, they contended, 1. That the appointment was an annual one, but if not annual, still the bond was only good for one year. Officers here, since the adoption of the constitution, hold as they do in *England*. There is no such thing in the *State*, as an officer holding at the pleasure of the government. They all hold, either during good behavior, or their appointments are annual. The 48th *section* of the constitution prescribes the tenure by which offices are to be held, and the 49th

speaks of the bonds to be given. The office of Register is not among those which are to be held during good behavior. The commission of the Register must expire on the third week in November in each year, and being an annual appointment, the sureties are only liable for one year. *Union Bank of Maryland vs. Ridgely,* 1 *Harr. and Gill,* 324, 328, 432. Bonds to the *State* are to be construed according to the intention of the parties, as bonds to individuals. *Lord Arlington vs. Merrick,* 3 *Saund.* 414. 2. But if the office is not annual, still the bond is good but for one year. That part of the constitution which speaks of the re-appointment, says nothing about the continuing responsibility of the old bond. It dispenses with a new commission and a second qualification, and it is to be supposed, that if they intended to dispense with a new bond, they would have so provided. Upon the question of the liability of the bond for more than the penalty, and to show that it cannot be liable for more, they referred to *Lansdale vs. Church,* 2 *Durnf. and East.* 388. *White vs. Sealy,* 1 *Doug.* 49. *Wilde vs. Clarkson,* 6 *Term Rep.* 303. 1 *Atk.* 79. *Tew vs. Earle of Winterton,* 3 *Bro. Ch. Cas.* 489. *Brangwin vs. Perrott,* 2 *Wm. Black,* 1190. 2 *Mar. Rep.* 221. *Wood vs. Wade,* 2 *Stark. Rep.* 167. 1 *Marsh. Va. Rep.* 26. *Arnold vs. U. States,* 9 *Cranch,* 109—*Act of* 1742. *ch.* 10.

EARLE, J. delivered the opinion of the Court.

On the trial of this cause in *Anne Arundel* County Court, both parties took exceptions, and have appealed to this Court. We will first decide on the exceptions taken by the *State,* and then turn our attention to those signed at the instance of the defendant.

The suit was instituted on an office copy of the bond of *Thomas H. Bowie,* late Register in Chancery, against *Henry Wayman,* one of his securities. The bond was entered into when *Thomas H. Bowie* was first appointed to the office, on the 24th day of January, 1816, and he continued to act as Register until his death, in 1821, without being

re-appointed by the Executive, or having renewed his obligation to the *State:* and the first question that presents itself is, can the plaintiff recover in this action, for the failure of *Thomas H. Bowie* to record all proceedings from the date of the bond, to the time of his death, which it was the duty of the Register of the Court of Chancery for the time being to record ?

This general question brings into immediate view the constitutional point in the cause, as well as the construction to be given to the contract contained in the obligation which is the ground of the action.    The one will be disposed of by a recurrence to the constitution itself, and the other by an examination of the language of the condition of the bond, in connexion with the act of Assembly under which *it* was given.

All appointments to office under the constitution, by the executive of the *State*, are made by the authority of the 40th, 48th and 49th sections ; and it not being pretended that the Register in Chancery is commissioned during good behavior, he is necessarily an officer of annual appointment, under the 49th section.    The tenure of his office being limited, he cannot continue to act after his term expires, except in the single instance of the appointment of a successor, in which case he may act until such successor, commissioned in his stead, is qualified.    If re-appointed, he may continue to act without any new commission or qualification, but unless re-appointed, he is not legally an incumbent of the office, and cannot lawfully perform any of its duties.    This is the plain interpretation of the constitution ; and in arriving at its meaning, our attention has been confined to the instrument itself, and we could not think ourselves at liberty to regard the devious course which is said heretofore to have been pursued in relation to the appointment of this officer.  ' The constitutional grant limits the duration of the office to a certain term, and no irregularities in the proceedings of the appointing power, can extend it beyond that period.    The idea so much insisted

on, of continuing office without a re-appointment, until a new appointment is made, it is supposed has grown out of these deviations from the constitutional law, and therefore cannot receive the sanction of this Court.

The parties to the bond, executed it with an express reference to the provisions of the constitution, as thus expounded; and if its language could create a responsibility, not comprehended within them, we do not think that the expressions of this contract operate such an effect. The condition rightly and properly pursues the form the act of 1742 prescribes, and its words that seem to look to an extended responsibility, are, " whilst he shall continue in the office of Register of the Court of Chancery," "and during the time he hath officiated in the said Register's office;" and these, we are clearly of opinion, are to be construed to relate to the time the officer lawfully continues in his office, and not to a period when he holds it without authority. The provisions of the constitution form the basis of the contract, and like the recital in the condition of a bond, restrain the indefinite expressions used in it, and adapt them to the intention of the parties. What this intention was at the time of making the contract, cannot be mistaken. It evidently was, to engage for a faithful discharge of duties, as long as they could be legitimately performed under the official grant, and no longer.

The question we have to decide in the second exception taken by the *State* is, whether the plaintiff could recover in the action a sum larger than the penalty of the bond sued upon. This subject is not without its difficulties, and they have arisen chiefly from discordant adjudications in reference to it. We will not attempt to point out these discordancies, but proceed at once with an expression of our own opinion, formed upon reflection, and on an attentive review of all the authorities we had an opportunity to examine.

When the penalty of a bond is sued for against a surety, the utmost that can be recovered is the penalty, and legal interest thereon, by way of damages, *pro detentione debiti.*

from the time the debt is demanded. This is the import and effect of his contract, and his accountability cannot be stretched beyond it. In this position we are fully sustained by many authorities, but by none more effectually than by 1 *Saund.* 58, note 1, and *Harris vs. Clap, et al.* 1 *Mass. Rep.* 308. This was an action against *Clap* and surety, on an arbitration bond, in the penal sum of $5000, conditioned to pay an award of $4618 62, which had remained so long unpaid, that the interest carried the amount greatly beyond the penalty of the bond. Under a rule of reference in the Court of Common Pleas, a judgment had been entered up on the award against *Clap:* he removed the case to the Supreme Court, on a petition of review, which had been dismissed. In the suit on the arbitration bond, *Clap* and his surety confessed the forfeiture of the obligation; and the question made was, what sum the plaintiff was entitled to recover against the defendants. The judges delivered their opinions at large, and determined that the judgments should be entered for the penalty of the bond, and interest thereon, by way of damages, for the detention of the debt from the time it was demanded by the writ; taking care that it should not exceed the sum due on the award, which was in truth and conscience the plaintiff's demand; and the chief judge declared, that in no case could the plaintiff's demand be allowed to overrun the penalty and interest thereon.

In the case under consideration, if the Court below had granted the plaintiff's prayer, sanction might have been given to a recovery opposed to this case of *Harris vs. Clapp, et al.* and as we believe, to several other authorities on this doctrine, that could easily be averted to. The plaintiff might have recovered $4000 or £1500, notwithstanding the penalty and interest fell greatly short of that sum. The prayer, however, was refused, and we entirely approve of the opinion given by the Court, which declared, that the plaintiff was not entitled to recover more than £1000, the penalty of the bond. It is not in every case that interest by way of damages is to be recovered on the penalty: and when the

case occurs, as it most commonly does where the obligee is plaintiff, or is asking in some form for relief, it may be considered as an exception to the general rule, which limits the recovery by the penalty of the bond. 3 *Caine's Rep.* 49. 1 *Dougl.* 49. 2 *Wm. Black.* 1190. 6 *Term Rep.* 303, (*no.*) *Equity Cases,* 92. 3. *Sergt. and Lowb.* 297. That the recovery in this action was properly so limited is apparent to us, when we call to mind that the question arose on a prayer to instruct the jury, who were to assess damages for breaches assigned or proved in the condition of a collateral bond, and were wholly unauthorised by the issues to find damages for the detention of the debt. Over the last they had no cognizance, and it cannot in any way be received in this case, as a subject for the instruction of the Court.

We have a word or two more for this branch of the case, before we dismiss it: We have to beg that our proposition may not be misunderstood. When we state, that the responsibility of a surety cannot be extended further than the penalty of the bond, with interest thereon, by way of damages; our meaning is, to apply it to a question of recovery in a single case, and in no manner to affect the rights of other persons, who may have just grounds to sue the same bond. If they have distinct demands, it is clear, that a recovery and payment in one suit can be no bar to other actions, in which the several claimants may recover to the same extent, and can only be limited by the penalty: and in particular cases, by the penalty and interest, as in *Harris vs. Clap, et al.*

Having decided on the exceptions taken by the *State,* we will now turn our thoughts, for a short time, to the four remaining exceptions, signed at the instance of the defendant. In the *third* exception the defendant's prayer is laid at the root of the action, and denies the *State's* right to maintain it. The plaintiff exhibited before the jury, sundry resolutions of the Legislature, authorizing the Governor and Council to contract, in the name of the *State,*

with some person or persons, to record the unrecorded papers in the Chancery office: and offered the proceedings of the executive under the resolutions. And also offered in evidence the original records, made under the said resolutions and proceedings, and which had been returned to the Governor and Council, and accepted by them, and remained in the Council Chamber for the purpose of binding up, before they were deposited in the Chancery office. He also offered in evidence that the proceedings in Chancery, before the end of the third week in November, 1816, required to be recorded by *Thomas H. Bowie,* and left unrecorded by him, had been recorded under the said resolutions and proceedings, and accepted by the Governor and Council, and deposited in the Council Chamber as aforesaid; and he produced the said records in Court, and offered further in evidence, that these last mentioned records cost the *State* about $725, which it had paid to the persons employed to make the same. The defendant on his part offered in evidence from the said records so produced, that many of the cases improperly omitted to be recorded by *Thomas H. Bowie,* were suits between individuals to which the *State* was not a party, and in which the *State* had no other interest than what belongs to it as the guardian of the rights of its individual citizens. And then prayed an instruction to the jury, that the plaintiff was not entitled *to recover* damages for the omission by *Thomas H. Bowie,* to record proceedings and decrees in suits, to which the *State* was not a party, and on account of which nothing was paid to *Bowie* by the *State,* or by him demanded of it. Our reflections on this point, have satisfied us, that the Court were right in refusing this direction to the jury. To say nothing at present of the acts of 1716, *ch.* 1, and 1742, *ch.* 10, which in terms give the action to the public, it appears to us, it may be sustained by the *State* on one ground without the aid of others. The records of our Courts of Justice are to be considered as public property, and so important is it to the community that they should be made up correctly and

preserved with care, that when a neglect in these particulars in any of its officers occurs, an obligation is imposed on the *State* to supply the defect, and have the work done at the expense of the Treasury. The defaults of the officers are thus visited on the public, and their bonds afford the only means of security for the *State* to resort to against loss.

The *fourth* and *fifth* exceptions present questions of evidence, and are of minor consideration, and will be disposed of at the same time. The defendant wished to give in evidence two record books, in which were recorded proceedings required to be recorded by *Thomas H. Bowie.* He proved by the present Register, that two such books were in the Chancery office, and being unable to produce them, he endeavored, by testimony, to show they were lost, in order to let in the secondary proof of them, which he offered to lay before the jury. The point then is, whether his testimony was sufficient to answer the purpose he had in view. Whether the evidence of the loss of the books, was such as to authorise the admission of the proof offered. The Court below thought it was not, and we cannot but coincide in the opinion. The utmost extent to which the testimony went, was to prove that the books inquired after had been missed from the Chancery office, and that there was every reason to believe they had been taken out by, and were in the hands of, some of the persons engaged in recording the Chancery proceedings, under the resolutions of the Legislature: and that *Joseph Mayo,* the only one of the recording Clerks applied to for these record books, stated he did not recollect having taken them out, and did not know that he had ever seen them out of the office; and while the trial was going on, that he made an unsuccessful search for them among the books and dockets in the committee room of the House of Delegates, which had been used by the Clerks when employed in recording the Chancery papers. This testimony is inconclusive and unsatisfactory, and leaves the mind in doubt, whether by a further

search the record books sought for, might not have been regained. Several persons were employed in making up these records, and for some purpose, it is believed, had these books, and yet one of them alone was applied to for them, and the application to him was made at so late a period, that a confused and hurried examination for them could only be made. This is not the reasonable diligence the law requires in hunting up lost records, and is insufficient to let in, to the jury, the parol proof mentioned in the *fifth* exception, or the inferior evidence offered by the defendant in the *fourth* exception. The primary character claimed on the argument, for the reports and orders in the time of Chancellor *Kilty,* made under the act of 1817, *ch.* 119, and offered in the *fourth* exception, cannot be acceded to them. If they are evidence at all, a point upon which it is unnecessary to make up an opinion, they must range in the subordinate class, and cannot be received to supply the place of a record, until conviction is produced on the minds of the Court of the loss of it. The principal objection made by the defendant in the last exception, to the instruction prayed by the plaintiff was, that the bond sued on was not required by the constitution or any then existing law, and therefore he was not legally responsible under the said bond, for the conduct of *Bowie,* as Register of the Court of Chancery, for any period of time. This is a question of some magnitude, and we must return again to the constitution for the solution of it. The sheriff is the only officer who is required, in express terms, by the constitution to give bond and security, and this, by the 42d *section,* he is bound to do, every year, *" as usual."* The form then in use was prescribed by the act of 1715, *ch.* 46, and it was constantly after used by the sheriff elected by the people, until the year 1794, when it was found expedient to increase the penalty and alter some parts of the condition. It was competent to the Legislature to prescribe a new form of bond for the sheriff, immediately after 1776; but at that juncture, there was other business to occupy that body, and they

were willing to repose upon the then laws of *Maryland,* which unquestionably formed the ground work of the constitution itself. How else are we to understand the before mentioned expression of the 42d *section, as usual,* which has a direct reference to the existing laws, or the practice under them. The County Clerks, by the constitution, are to hold their commissions during good behavior, and although *they are not expressly directed to give bond and surety,* as in the case of the sheriff, from the year 1776 to the year 1800, bonds were given by them, and that according to the form prescribed by the act of 1742, *chap.* 2. In the last mentioned year, the year 1800, a law was passed compelling the Clerks of the County Courts to give bonds in larger penalties, and with a different form of condition. *The same may be said of the other officers* named in the act of 1742, and in the constitution of the *State;* all of whom, at one period or other, within the last fifty years, have complied with the act, and given bond, pursuant to its provisions, without any respect whatever to the tenure of their offices, which, under the *Provincial* government, it is believed, was only *durante bene placito.* *Bordley vs. Lloyd,* 1 *Harr. and M'Hen.* 27. All this uniformity of proceeding, from the earliest times, goes forcibly to prove, that the acts of 1716, *ch.* 1, and 1742, *ch.* 2, were existing laws at the adoption of the constitution, and were so considered by those who were first engaged in carrying it into execution. If this wants further confirmation, we think it may be found in the 10th *section* of the constitution itself, which seems to point to those laws, and to imply strongly, that other officers than the sheriff were to give bond with security. The section gives to the House of Delegates power to direct all office bonds, which are to be made payable to the *State,* to be sued for any *breach of duty.* We clearly think, then, that the defendant was responsible under the bond, for the conduct of *Bowie,* as Register of the Court of Chancery, the first year he was in office. Other objections were started by the defendant to the plaintiff's prayer in the last

exception, all of which we consider groundless, and as forming no legal impediment to the instruction given by the Court to the jury. We do not deem it necessary to give them a particular notice.

JUDGMENT AFFIRMED.